765 So.2d 1230 (2000)
STATE of Louisiana, Appellee,
v.
Edward Earl HARRIS, Appellant.
No. 33,406-KA.
Court of Appeal of Louisiana, Second Circuit.
August 25, 2000.
*1232 Peggy Sullivan, Louisiana Appellate Project, Counsel for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, Stephen T. Sylvester, Assistant District Attorney, Counsel for Appellee.
Before BROWN, STEWART and CARAWAY, JJ.
CARAWAY, Judge.
Defendant was convicted of two counts of aggravated rape which occurred to separate victims in the Monroe area in early 1997. He was sentenced to serve consecutive terms of life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence. Defendant appeals his convictions, assigning six assignments of error. Finding no merit to defendant's arguments, we affirm.

Facts
On May 28, 1997, the defendant, Edward Earl Harris ("Harris"), was charged by grand jury indictment of two counts of aggravated rape in violation of La. R.S. 14:42. The facts leading up to Harris's arrest are as follows.
In February 1997 in Monroe, Harris's first victim ("AR") was awakened at 5:00 a.m. by the defendant lying next to her in her bed, his face covered with what appeared to be a black sheet. When AR asked the defendant about his identity, he called her by her first name and told her to shut up. He then placed a blindfold over her eyes, told her that he had a gun, which he pressed against her throat, and threatened to use the gun if she did not comply with his demands. Harris then performed oral sex on AR and raped her. Penetration occurred and the defendant ejaculated. About thirty minutes after Harris left AR's apartment, she went to the home where her boyfriend was staying. She told her boyfriend what happened, and they called 911.
Upon investigation of the crime scene, Ouachita Parish Sheriffs Deputy Connie Miller ("Deputy Miller") found a blue bandana behind AR's apartment door; the bandana did not belong to AR or her boyfriend. Also, a black jacket owned by AR was discovered to be missing shortly after the crime. A medical examination of AR performed on the morning of the rape confirmed sexual intercourse had taken place.
The facts giving rise to the second charge of aggravated rape occurred on April 4, 1997. At about 9:00 that evening, Harris's second victim ("LC") came home from work to her apartment in West Monroe. LC left her keys, cell phone and purse on her kitchen table and left her door unlocked and open while she walked her dog. Once back in her apartment, LC phoned her neighbor to ask him about a suspicious black man she saw her neighbor talking to. Her neighbor told her that the man said that he was looking for someone in the apartment complex, mentioned a name that the neighbor did not recognize, and walked away.
While LC was in bed watching television at 9:49 p.m., she heard someone "jiggling" at the back door. She again telephoned her neighbor and asked him if he could see who was at the door. The neighbor told her that he could not see anyone. LC then saw Harris standing in her hallway, and told her neighbor that someone was in her apartment. Her neighbor called 911 and reported the incident to the police.
Harris had a gun and told LC not to look at him. He put the gun to her, blindfolded her with her black robe, and called LC by her first name. Harris raped LC. Penetration occurred and as the defendant ejaculated, someone began knocking on LC's apartment door.
Police officers soon entered LC's apartment, pushed Harris against the wall and questioned LC. A search of LC's apartment *1233 revealed the gun Harris used on the floor in LC's closet.
After a trial by jury, Harris was convicted on both counts of aggravated rape. He was sentenced to serve consecutive terms of life imprisonment at hard labor, without benefit of probation, parole, or suspension of sentence. He appeals his guilty verdict, complaining that (1) the evidence was insufficient to convict him; (2) the trial court erred when it denied his motion to sever; (3) the trial court erred in failing to dismiss a juror for cause; (4) the trial court erred in allowing testimony protected by the physician-patient privilege; (5) the trial court erred when it failed to hold a recess to allow defendant to locate a subpoenaed witness; and (6) the trial court erred in denying defendant's motion for new trial and his post verdict judgment for acquittal. Finding no merit to Harris's assertions, we affirm both his conviction and sentence.

Discussion

Sufficiency of Evidence
Harris argues that the state did not prove beyond a reasonable doubt that he raped AR. He contends that the evidence was entirely circumstantial, and that the only evidence connecting him to AR's rape was the black jacket found in a later search of his wife's residence. Harris claims that the black jacket and other seized items could have belonged to any of the other residents of the home. He further argues that no one, including AR, identified him as her rapist.
Also, Harris argues that there was not sufficient evidence to convict him of LC's rape. He contends that LC gave conflicting accounts of the rape, including conflicting information concerning actual penetration. He argues that no medical testimony was admitted to support LC's claim of rape with physical findings.
The proper standard of appellate review for a sufficiency of evidence claim under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438.[1] The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when viewing the evidence in the light most favorable to the prosecution, whether the possible alternative hypotheses is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. State v. Owens, supra. This is not a separate test from Jackson v. Virginia. Id.
*1234 An appellate court does not evaluate credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987). Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12.
In this case, to convict Harris of the crime of aggravated rape, the state needed to prove beyond a reasonable doubt that (1) anal or vaginal sexual intercourse occurred, (2) without the lawful consent of the victim, (3) and the rape[2] was committed by any one or more of various threatening circumstances listed under La. R.S. 14:42. Here, the state put forth evidence showing that Harris used force to overcome his victims, that Harris prevented his victims from resisting the rape with threats of great and immediate bodily harm, and that Harris prevented his victims from resisting the rape because he was armed with a dangerous weapon, i.e., a handgun.
It is clear from AR's undisputed testimony that she was a victim of aggravated rape. She testified that, without her lawful consent, she was forced to engage in sexual intercourse, wherein penetration occurred. Her testimony regarding vaginal penetration was supported by the medical testimony of the emergency room physician. AR also testified that the rapist told her that he had a gun, which he pressed against her throat and threatened to use if she did not comply with his demands. This proved that Harris was both armed with a dangerous weapon at the time of the rape, and that he prevented AR from resisting the rape by threats of great and immediate bodily harm, accompanied by the apparent power of execution.
Furthermore, the search of the residence produced a black jacket that was identified at trial by both AR and her boyfriend as belonging to AR. Also, when questioned by Officer Jay Via about some evidence seized in the search, Harris immediately referred to the black jacket and told Officer Via that it belonged to his niece, even though Officer Via had never told Harris that the black jacket was seized.
The search of the residence also produced a green bag containing two bandanas, a black face mask that completely covers one's head with no mouth or eye openings, and a pager receipt bearing the name of "Emanuel" Harris. The bandanas were very similar to the bandana left behind by AR's rapist. The face mask was identified by AR as the one worn by her assailant.
Despite AR's inability to make a direct identification, the extensive circumstantial evidence shows beyond a reasonable doubt that Harris was, in fact, her rapist. Items of physical evidence seized from Harris's wife's residence link him to the crime, the most condemning of which is AR's black jacket. Furthermore, AR's boyfriend positively identified Harris as the same person who had appeared at the door of AR's apartment late one night prior to the crime. The boyfriend testified that Harris identified himself as "Emanuel," that he was wearing a bandana like those found in Harris's residence and that he stated that he was looking for someone who lived in the apartments. In addition, AR's boyfriend testified that Harris was wearing a ponytail-like hairpiece later seized at the residence.
Viewing the physical evidence and the inferences drawn from the circumstantial *1235 evidence in the light most favorable to the prosecution, it is clear that the evidence was sufficient to prove that Harris committed the aggravated rape of AR.
Likewise, the evidence presented at trial was sufficient to convict Harris of LC's rape. LC testified that, without her lawful consent, she was forced to engage in sexual intercourse, wherein penetration occurred. LC also testified that Harris had a gun, which he pointed at her and threatened to use if she looked at him. Thus, all of the essential elements of the crime of aggravated rape were proven by the state.
Harris argues that he did not rape LC, and that the act was consensual sex in exchange for drugs. However, through the cross-examination of the state's witnesses, Harris established no evidence to support this allegation. Viewed in the light most favorable to the prosecution, the jury was correct in determining that Harris's alternative hypothesis was not sufficiently reasonable. Jackson v. Virginia, supra.
The record evidence, both direct and circumstantial, is more than sufficient to support the finding beyond a reasonable doubt that the defendant committed aggravated rape in both cases. Jackson v. Virginia, supra. This assignment of error lacks merit.

Denial of Motion to Sever
In his second assignment of error, Harris complains of the trial court's denial of his Motion to Sever. Prior to trial, Harris filed two separate motions to sever the charges against him, claiming that trying the two charges in one trial would lead to prejudice. Harris also claimed that the state wanted to try the two cases together to portray him as a serial rapist in front of the jury. Both motions were denied by the trial court. On appeal, Harris argues that the state tried the two cases together to bolster each case, which might not have been strong in their own right. He contends that judicial economy was minimal because each case involved different witnesses, and that the prejudice to him was great because of the joinder. We disagree.
La.C.Cr.P. art. 493 provides that two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.
The Louisiana Supreme Court, when addressing a defendant's motion to sever, has held that:
Such a motion is addressed to the sound discretion of the trial court and the court's ruling should not be disturbed on appeal absent a showing of abuse of discretion. State v. Williams, 418 So.2d 562 (La.1982). According to State v. Washington, 386 So.2d 1368 (La.1980), considerations for the trial court in determining whether prejudice may result from joinder include:
whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.
State v. Celestine, 452 So.2d 676, 680 (La. 1984); see also, State v. Mims, 478 So.2d 685 (La.App. 2 Cir.1985).
In this case, the record shows that evidence was presented in an orderly fashion. Evidence was presented chronologically and each crime was presented separately. The crimes were not confused in any way. In fact, a 26-point comparison[3] presented *1236 by a sex crime expert was helpful in the organization of the evidence while at the same time demonstrating the similarity of the common scheme of the crimes. Thus, evidence of one offense would have been admissible as evidence of the other offense. Clear instructions to the jury, and the state's orderly presentation of the evidence eliminated any problems arising out of the different crimes charged. The two counts were properly tried in one trial, and the trial court did not abuse its vast discretion in refusing to grant Harris's motion to sever. This assignment of error lacks merit.

Denial of Defendant's Challenge for Cause
Harris's next assignment of error concerns the trial court's failure to dismiss juror Nugent for cause. During voir dire, Nugent was challenged because of his friendship with one of the police officers who testified at trial regarding the investigation. Harris contends, for the first time on this appeal, that Nugent also indicated that he would not properly require the state to prove guilt beyond a reasonable doubt. Harris used all twelve of his peremptory challenges, including one to exclude Nugent, and therefore argues that the trial court committed reversible error in refusing to grant his challenge for cause.
In order for a defendant to prove reversible error warranting reversal of both his conviction and sentence, he need only show the following: (1) the erroneous denial of a challenge for cause; and (2) use of all his peremptory challenges. State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651, and cases cited therein.
La.C.Cr.P. art. 797 provides in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
* * * *
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court.
This court has held that a trial court is vested with broad discretion in ruling on challenges for cause, and its ruling will be reversed only when a review of the entire voir dire reveals that the court abused its discretion. State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, 96-1991 (La.2/21/97), 688 So.2d 521, citing State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. A refusal by a trial judge to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Robertson, *1237 92-2660 (La.1/14/94), 630 So.2d 1278; State v. Cross, supra, State v. Ellis, supra.
As Chief Justice Calogero stated in State v. Lee, 559 So.2d 1310 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991):
When a juror expresses a predisposition as to the outcome of a trial [or in this case, as to a particular sentence], a challenge for cause should be granted. Yet, if after subsequent questioning the juror exhibits the ability to disregard previous views and make a decision based on the evidence presented at trial, the challenge is properly denied. When assessing whether a challenge for cause should be granted, the trial judge must look at the juror's responses during her entire testimony, not just "correct", isolated answers, or, for that matter, "incorrect", isolated answers. (Citations omitted)
The trial judge must grant a cause challenge "even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied." State v. Jones, 474 So.2d 919 (La.1985), cert. denied, 501 U.S. 1267, 112 S.Ct. 8, 115 L.Ed.2d 1093, (1991).
The mere fact that a prospective juror is somehow related to a law enforcement officer is not sufficient to grant a challenge for cause. Such should be granted only if that relationship influences the juror in his ability to make a decision in the case. State v. Lee, supra.
The issue of Nugent's relationship with Officer Gray was reviewed with Nugent by the prosecutor during voir dire, as follows:
Q. And how long have you known Mike?
A. Probably three (3) or four (4) years.
Q. Is there anything in your relationship with Mike Gray or due to the fact that you know Mike Gray would you give his testimony more credence or credibility than you would any other witness?
A. No.
Q. What is your relation with him?
A. We play golf together. My brother-in-law use to work with him as a detective and that's how I know him.
Q. Alright. Did your brother-in-law ever come home and talk to you about his work?
A. No.
Q. Is the fact that you had a brother-in-law that was in law enforcement would that affect your ability to make a decision?
A. No.
On questioning by defense counsel, Nugent further elaborated on his relationship with Officer Gray:
Q. Mr. Nugent, let me ask you a little bit about your relationship with Detective Gray. You indicated that you play golf with him, is that correct?
A. Yes, we play golf and cards every Tuesday night.
Q. Who plays cards with you besides him on Tuesday?
A. It's a group of us out there at Pine Hills. We play gin and cops are there, Brent Chappell and Officer Pat Kelly he's there.
Q. How long have y'all been doing this?
A. We do it every year in the winter months.
Q. And for how long?
A. At least three (3) years.
In these responses, despite his social relationship with Officer Gray, Nugent indicated that he would not be influenced by the relationship, or credit Officer Gray's testimony improperly. In denying the challenge for cause, the trial court expressly noted Nugent's response concerning his ability to remain unbiased.
In State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713, a juror was challenged for cause, because he and the murder victim knew each other for two years and drank beer together at a local club. Additionally, *1238 the juror spoke with a prosecution witness prior to trial about the murder. Nevertheless, the court found that the juror's relationships with both the victim and the witness were not extensive and, as revealed in voir dire, would not in any way influence his verdict.
From our review of La.C.Cr.P. art. 797(3), we note that the relationships specifically identified in the article are those between the juror and "the defendant, the person injured by the offense, the district attorney, or defense counsel." While a close friendship between a juror and a witness might allow the juror to be challenged for cause for lack of impartiality, the code article does not specifically require that the relationship be closely scrutinized. Therefore, in this case, while the trial court expressed concern about the friendship between juror Nugent and Officer Gray, the court could determine upon the voir dire questioning that Nugent would remain impartial in his consideration of the case.
Harris next complains about Nugent's alleged misunderstanding of the state's burden of proof. When questioned by defense counsel about the state's burden of proof, Nugent responded:
Q. Okay, why don't you pass it down to Mr. Nugent? Mr. Nugent, what does the term beyond a reasonable doubt mean to you?
A. There's no doubt in my mind that he has (inaudible) guilty.
Q. Okay, And could you convict if all you had was testimony and nothing else could you convict on that?
A. No.
Q. What does it take if someone takes the stand and asks you to believe something, ask you to believe what they're telling you how do you evaluate that? How do you evaluate their credibility?
A. By how they're answering the questions....
* * * *
Q. Okay .... the Court will instruct that even if you believe someone is likely, probably to be guilty unless it's beyond a reasonable doubt you must acquit what do you think about that?
A. I'd have to agree with it.
Q. Well, you hesitated a little bit there.
A. Well, I was just thinking about the question.
Q. Okay. Well, it's a serious question and it doesn't get anymore serious but it calls on you to at least the possibility of setting someone free who you believe likely is guilty.
A. Right.
Q. Now, you-you know, is that really, really something that you can do?
A. I don't know. I doubt it. I mean if I feel that he's guilty it would be kind of hard for me to say that he's not guilty, you know, acquit him.
Q. Even if it's beyond a reasonable-not been proven beyond a reasonable doubt?
A. Right.
Despite the fact that Nugent's mixed responses in this line of questioning can be viewed as "incorrect," the defense never presented a specific objection regarding Nugent's inability to hold the state to its burden of proof. Later, when the trial court was questioning Nugent with respect to his relationship with Officer Gray, the court by its own initiative chose to further question Nugent about the state's burden of proof because of Nugent's prior answers as quoted above. We also note that earlier during voir dire, Nugent reported to the trial court an incident that occurred outside the courtroom, in which Nugent meticulously followed the court's instruction and avoided overhearing a conversation wherein the details of the present case may have been discussed. Nugent reported the incident to the court, was examined concerning the incident, and found to be uninfluenced by the incident because of his evasive actions. The trial court, therefore, had considerable opportunity in Nugent's entire examination to determine his ability to follow the instructions of the court, including the instruction concerning the state's burden of proof.
The trial court has the right pursuant to La.C.Cr.P. art. 787 to challenge *1239 a potential juror, ex propio motu. State v. Myles, 262 La. 633, 264 So.2d 589 (1972). Nevertheless, defense counsel, not the trial judge, has the duty of challenging for cause any member of the jury venire who displays a ground for cause under La.C.Cr.P. art. 797. State v. Woods, 444 So.2d 1332 (La.App. 2d Cir.1984).
Furthermore, La.C.Cr.P. art. 800 states in pertinent part:
A. A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of the objection. (Emphasis ours)
Here, notwithstanding the fact that the trial court noticed Nugent's statements during voir dire regarding his ability to apply the appropriate burden of proof, Harris was still required to state the nature and grounds of his objection to preserve the issue for our review. La.C.Cr.P. art. 800; see also, State v. Fairley, 25,951 (La.App.2d Cir.5/4/94), 645 So.2d 213, 219, writ denied, 94-1940 (La.11/11/94), 645 So.2d 1152, and writ denied, 94-2909 (La.3/24/95), 651 So.2d 287.
The record clearly shows that Harris's only stated objection to the trial court's denial of his challenge for cause of juror Nugent pertained to the social relationship between Nugent and Officer Gray. At no time did defense counsel state as a ground for objection Nugent's alleged failure to apply the law regarding the state's burden of proof, and the court in any event could properly satisfy itself regarding juror Nugent's ability to apply the law and serve. This assignment of error has no merit.

Physician-Patient Privilege
During the trial, Harris objected to the testimony of Dr. Lisa Walton as privileged. Dr. Walton, a physician, examined Harris during his incarceration. Her first two examinations are the subject of this assignment of error in which Harris claims a violation of the physician-patient privilege under La. C.E. art. 510.
In a standard health exam, Dr. Walton first examined Harris upon his entry into the correctional facility as an inmate. Dr. Walton testified that at the conclusion of her exam, Harris asked a few questions that did not relate to him personally. First, he wanted to know whether a physician could tell whether a female had intercourse within the previous two weeks, and whether a physician could tell whether a female had been raped or had oral sex. Harris asked very detailed questions about the entire process of evidence collection from both the victim and the perpetrator. Dr. Walton explained how a rape kit was performed, including the fact that pubic hair of the perpetrator would be collected, and that evidence would be collected from the victim's pubic area which might include the perpetrator's pubic hair, saliva or skin cells. Dr. Walton made a report regarding this examination, which did not note anything unusual about Harris's body hair.
Dr. Walton reported that her next examination of Harris was pursuant to a "sick call request" when Harris complained of a groin problem. Dr. Walton performed a thorough genital examination, and noted that Harris's pubic hair had been completely shaved since the last exam.
La. C.E. art. 510, effective in 1993, governs the physician-patient privilege and provides in pertinent part:
C. (1) General rule of privilege in criminal proceedings. In a criminal proceeding, a patient has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made for the purpose of advice, diagnosis or treatment of his health condition between or among himself, his representative, and his physician or psychotherapist, and their representatives.
(2) Exceptions. There is no privilege under this Article in a criminal case as to a communication:
(a) When the communication is relevant to an issue of the health condition *1240 of the accused in any proceeding in which the accused relies upon the condition as an element of his defense.
(b) When the communication was intended to assist the patient or another person to commit or plan to commit what the patient knew or reasonably should have known to be a crime or fraud.
The article defines "confidential communication" as including "any information, substance, or tangible object, obtained incidental to the communication process and any opinion formed as a result of the consultation, examination, or interview and also includes medical and hospital records made by health care providers and their representatives." La. C.E. art. 510(A)(8)(b).
Comment (a) to Article 510 states that the article is, to a large extent, a codification of pre-existing Louisiana law. From our examination of the jurisprudence, particularly State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), the privilege was not recognized when the medical examination was a mandatory step in the incarceration process. This ruling would place Dr. Walton's first examination of Harris outside of the privilege. On the other hand, when the patient consulted the physician for treatment or for diagnosis looking toward treatment and the communication was made in confidence, the privilege would apply. State v. Carter, 383 So.2d 357 (La.1980). These rulings appear to remain applicable under Article 510(C) which applies to confidential communications for advice, diagnosis and treatment; therefore, Dr. Walton's second examination of Harris for his "sick call request" involves a privileged situation.
Nevertheless, we pretermitted any detailed review of the application of the privilege under Article 510 due to the marginal relevance of Dr. Walton's testimony regarding the defendant's guilt. As shown by our sufficiency of evidence review, the record shows overwhelming evidence of Harris's guilt on both aggravated rapes, even without mention of Dr. Walton's testimony. Thus, we hold that any error from the allowance of Dr. Walton's testimony regarding her observations during Harris's second examination was harmless error beyond a reasonable doubt. La. C.Cr.P. art. 921.

Denial of Recess During Trial
Harris's next complaint stems from the trial court's denial of his request for time to find an absent witness at the start of his case-in-chief. The record reveals that during the presentation of the state's case, defense counsel mentioned that he subpoenaed Samantha Works ("Works") as a witness prior to trial, but that as of the time of trial, she had not been served. Although defense counsel contended that he expected Works to testify that she was present during an alleged drug deal between Harris and LC, he admitted at trial that he had not yet interviewed Works and was unaware of her whereabouts. Harris's counsel asked the state's attorney for any information as to Works's whereabouts. The state conjectured that Works was located in Shreveport, but did not know more specific information.
After the state rested its case, the defense moved for a recess for time to find the absent witness. Defense counsel alleged that an investigator had leads as to Works's whereabouts. In denying the motion for recess, the trial court was emphatic that it could not recess or continue a jury trial when the defendant could not state a period of time within which the witness would appear.
A motion for recess is evaluated by the same standards as a motion for a continuance. To be entitled to a recess to secure the presence of a witness, the defendant must establish that (1) the absent witness is expected to testify to material facts so that the presence of the witness at trial is necessary; (2) the witness will probably be available at the time to which the trial is deferred; and (3) due diligence was used in an effort to procure attendance *1241 of the witness. La.C.Cr.P. art. 709; State v. Wille, 559 So.2d 1321 (La.1990), appeal after remand, 595 So.2d 1149 (La. 1992), certiorari denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). The decision on a motion for a recess lies within the discretion of the trial court and will not be overturned absent abuse of that discretion. State v. Wille, supra; State v. George, 26,867 (La.App. 2 Cir. 4/5/95), 652 So.2d 1382, writ denied, 95-1151 (La.9/29/95), 660 So.2d 855.
It is clear from the record that at the time the recess was requested, Harris had no knowledge of the content and materiality of Works's testimony, because she had not been interviewed prior to trial. Defendant therefore failed to prove that the presence of the witness was necessary at trial. The record also clearly shows that Harris could not demonstrate that Works would be available at all, much less that she would probably be available at a set time to which the trial would be deferred. The defendant could only assert that an investigator had "some leads" on Works's whereabouts and was trying to locate her. Lastly, it is obvious that Harris did not use due diligence in procuring Works's attendance. Defendant issued the subpoena prior to trial and declared that he was ready for trial. However, he waited until the trial was well under way to attempt to procure the absent witness, and even had to ask the state for information as to the witness's whereabouts. Thus, the trial court did not abuse its vast discretion in denying Harris's motion for recess. This assignment of error is without merit.

Motion for New Trial/Post Judgment Verdict of Acquittal
After the jury found Harris guilty on both counts of aggravated rape, he filed a motion for new trial and post verdict judgment of acquittal. Both were denied. In denying Harris's motion for post verdict judgment of acquittal, the trial court stated that it agreed wholeheartedly with the jury's guilty verdicts and found the evidence of guilt to not only be sufficient, but overwhelming. In denying the motion for new trial, the trial court found no injustice to the defendant, and in fact found that justice had been well served by the jury's verdict.
Harris now argues that based upon La. C.Cr.P. arts. 821 and 851, he should have been granted a post-verdict judgment of acquittal or a new trial, because an injustice had been done to him. Under this assignment of error, Harris does nothing more than present the above-cited articles.
Based upon our ruling above regarding the sufficiency of the evidence and the lack of any showing by defendant of grounds in support of his motion for new trial, the trial court correctly denied both motions by defendant. The assignment of error has no merit.
We have reviewed the record for error patent but found none.

Conclusion
For the foregoing reasons, Harris's convictions and sentences are affirmed.
AFFIRMED.
STEWART, J., concurs in the result only.
BROWN, J., concurs. We should simply defer to the jury's factual findings.
NOTES
[1] La. R.S. 15:438. Circumstantial evidence

The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
[2] La. R.S. 14:41 defines rape as the act of anal or vaginal sexual intercourse with a male or female person committed without the person's lawful consent. Emission is not necessary and any sexual penetration, vaginal or anal, however slight, is sufficient to complete the crime.
[3] Officer Jay Via, a detective with the Ouachita Parish Sheriff's Department, was qualified as an expert in the field of sex crime investigation. In the course of his investigation and analysis of the two rapes, he prepared a list of over twenty characteristics that were common to the two rapes. Some, but not all, of the similarities include: (1) Harris talked to both victims, calling each of them by their first name, telling them that he had worked with them, and that he wanted to make them "feel good;" (2) he blindfolded both victims, and threatened each woman with a gun; (3) he told them that if they did not look at him, he would not hurt them; and (4) both victims were white females who drove small red cars and purchased gas at the same Citgo station.