I .BROWN, C.J.
A jury found defendant, Jimmy Ray Washington, guilty of three counts of aggravated rape, two counts of armed robbery, one count of aggravated oral sexual battery and two counts of indecent behavior with juveniles.[1] Defendant was sentenced to three consecutive life sentences for the rape convictions, 99 years at hard labor on one armed robbery conviction[2], 40 years at hard labor on the other armed robbery conviction[3], 20 years at hard labor on the aggravated oral sexual battery conviction[4], and one year at hard labor on each indecent behavior conviction[5]. Defendant, who was connected to each crime scene by DNA evidence, has appealed his convictions and sentences. Finding no error, however, we affirm.

Facts

On the night of June 7, 1999, L.W. was asleep in her home in Shreveport. Her 12-year-old son was asleep in another bedroom. L.W., who was awakened between 3:00-4:00 a.m. by someone touching her, found a man standing over her. The room was dark and the man was wearing a mask. L.W. struggled until the intruder threatened her with a gun. He told her that if she did not cooperate with him he would shoot her. It was too dark for L.W. to recognize any features other than that the man was black, h L.W. believed that he looked and sounded like Jessie or Jerome Mosley, brothers who lived across the street from her.[6]
L.W. initially thought that the intruder was there to rob her and gave him one of her rings. He then made her take off her shorts and vaginally raped her.
Officer Michael Greber, the first officer on the scene, found that a large glass pane from a window had been removed in order for the intruder to gain entry. Blood was found on the window sill and on L.W.’s bed, apparently from the intruder cutting himself on the glass. Blood and semen were collected for DNA testing.
L.W.’s neighbors, Jerome and Jessie Mosley, agreed to give samples for DNA comparison. Neither matched the blood and semen evidence found at the home and recovered from the victim.
F.Y. lived in the same neighborhood as L.W. Within two months of L.W.’s rape, on July 30, 1999, while asleep in her home, F.Y. was sexually assaulted. F.Y.’s two younger sons were asleep in their mother’s bedroom. Her two elder children were not at home. The 13-year-old was sleeping on a pallet on the floor and the 11-year-old was sleeping in the bed with his mother. In the early morning hours, F.Y. was awakened by someone “bothering” her, touching her between her thighs. It was very dark and she couldn’t see who it *100 was. F.Y. initially thought that it was her boyfriend, who although he was not living with her did have a key.
|SF.Y. realized that it was not her boyfriend when she saw that the man was holding a knife to her throat. She began to scream. The intruder kept the knife at her throat and put his hand over her mouth. In the darkness, F.Y. could not tell whether the intruder had on a mask (she thought he had a stocking over his face) or whether he was black or white. She thought that he was black from his voice.
F.Y. told her oldest son to turn on the light, but the intruder blocked the light switch and pushed the child away. F.Y. woke up her younger son and then got up herself. The intruder tried to get her to go into another bedroom, but she refused to leave her children. Next, F.Y. asked to go to the bathroom. The intruder denied that request, but took F.Y. and her sons into the kitchen. Along the way, F.Y. noticed that the front door was propped open with a stick. F.Y. attempted to “pull for the door,” but the intruder kicked the door and held the knife towards F.Y.’s older son, telling her that if she made another wrong move, her son was going to die.
In the kitchen, the intruder made the older son get a glass and give it to his mother to urinate in. Afterwards, the intruder took F.Y. and her children back into her bedroom. He made the two boys, who were crying, get onto their mother’s bed and then began fondling F.Y.’s breasts with one hand as he held a “long silver knife” in the other hand. F.Y. was standing up and was scared to resist because of the knife. The intruder told F.Y. to turn around, pull her shorts and underwear down and bend over a dresser. As she complied, the intruder vaginally raped her. F.Y. was uncertain as to whether he ejaculated or not.
1 ¿After the intruder finished, he told F.Y. and her sons to get on their knees and face the wall. One of the boys told the intruder that there were two dollars on the dresser. When they got onto their knees and turned to face the wall, the intruder ran out the front door. F.Y. called 911 from a neighbor’s house. F.Y. was confused as to how the intruder had gotten into her locked home, but after the police arrived, she saw that a side window had been opened and one of the panes removed. Although F.Y. knew defendant from school and the neighborhood, she testified that her home was too dark for her to ever see her attacker’s face. The money which had been on the dresser was gone.
The older son testified that on the night his mother was assaulted, he was sleeping on the floor and was awakened by someone standing on his hand. He could tell that the person standing over him was a black man. He saw the intruder grabbing at his mother and heard him demanding sex as he had the knife at her neck. He also heard the intruder tell his mother to pull her clothes off and watched as he had sex with her. The older son testified that, in an attempt to stop the intruder, he offered him the money on the dresser if he would leave his mother alone.
Officer Timothy L. Stephens testified that he spoke with F.Y. around 5:00 p.m. on July 30, 1999. She had found an intact window pane that had been removed from a side window and put under the house. Officer Stephens took fingerprints from the glass. The prints were not those of the defendant.
|BOn September 17, 1999, the crime lab notified the police department that DNA matches show that the same man had raped L.W. and F.Y.
*101 A few days later, on September 20,1999, C.M. was sleeping in her home in the Werner Park area of Shreveport. Asleep with C.M. was her six-year-old daughter. C.M. awoke in the early morning hours and saw a masked man standing at the foot of her bed. She did not recognize the intruder, but noticed that he was a black man and that he had a handgun.
C.M.’s daughter woke up, saw the intruder, and began screaming and crying. The intruder pointed the gun at C.M. and told her to make her daughter be quiet. The intruder found C.M.’s wallet on the dresser and took the money out of it. He also took $40 from her checkbook which was in a dresser drawer. Next, the man told C.M. to get out of bed, turn around, pull her pajama bottoms down and bend over. During this time, the child was crying for the intruder not to hurt her mama.
The assailant initially tried to insert his penis into C.M.’s anus, but was not successful. Frustrated, he told her to turn around and sit down on the bed. The intruder got a pair of pants from a laundry basket and put them over C.M.’s face. With the gun pointed at C.M.’s head and the child on the bed watching, the intruder compelled C.M. to perform oral sex and then he vaginally raped her. All of this occurred in front of the child.
C.M. was taken to LSU Medical Center where a rape kit examination was performed; the evidence collected was sent to the crime lab. The crime scene was investigated by Detective Clarence Van Wray, who noticed the similarities to the L.W. and F.Y. rapes. Like these two earlier assaults, putty | fihad been removed from a window and a pane taken out to gain entry. Likewise, light bulbs had been removed or loosened to prevent the victims from seeing their attacker’s face. Detective Wray found a reddish stain on C.M.’s comforter that appeared to be blood, as well as blood on a piece of window glass, a napkin and a piece of toilet paper. The items were taken as evidence and sent to the crime lab.
In light of the above similarities and the fact that the three rapes occurred within a two to three mile triangle, the Shreveport Police focused their investigation on a serial rapist. Defendant was developed as a suspect and he was arrested and questioned about the rapes.[7] During questioning, defendant denied raping either L.W. or F.Y.[8] A search of defendant’s home turned up a small 9 mm. handgun. Samples were obtained from defendant for DNA comparisons.
Connie Brown, a forensic DNA analyst with the crime lab, testified as an expert witness regarding the DNA evidence relied upon by the state in connecting defendant to the three sexual assaults. Ms. Brown initially testified about the testing protocols of the lab, as well as the retrieval and storage procedures for DNA evidence. She also noted that there was no such thing as a “false positive” in the area of DNA analysis. Ms. Brown testified that the DNA results showed that the blood, semen and other bodily |7fluids collected from the three rape scenes and victims were identical and matched samples obtained from defendant after his arrest. Ms. Brown calculated the odds of an Afri *102 can American, other than defendant, having the same DNA profile as the blood and semen taken from the crime scenes, at one in 38.4 trillion.
On December 16, 1999, the grand jury indicted defendant with three counts of aggravated rape, one count of aggravated oral sexual battery, three counts of armed robbery and one count of aggravated burglary.[9] On May 9, 2000, the district attorney signed and filed an amended indictment that included two additional counts, those charging defendant with indecent behavior with juveniles.
Defendant filed a motion to quash the new indictment and to sever the charges for trial. In his motion to quash, he asserted that the district attorney did not have the authority to add new charges to the indictment without first presenting them to the grand jury. The trial court granted the motion to the quash and the state filed writs with this court. On June 29, 2000, this court granted the writ (34,-205-KW) and made it peremptory, reversing the trial court, holding that “the district attorney has the power and authority to amend grand jury indictments, both as to form and substance, prior to trial.”
The trial court granted the motion to sever as to count six in the amended indictment, the charge for the September 16, 1999, aggravated |sburglary of Linda Kingsby’s home. The trial court allowed the remaining nine counts, all of which arose out of three incidents, to be tried jointly.
Trial was held June 26-28, 2001. Defendant did not testify, nor did he present any evidence. The jury found defendant guilty of the three aggravated rape counts; guilty of the armed robberies of L.W. and C.M.; guilty of the aggravated oral sexual battery of C.M.; guilty of the two counts of indecent behavior with juveniles; and not guilty of the armed robbery of F.Y.
Defendant filed a motion for post-verdict judgment of acquittal, which was denied by the trial court. Thereafter, the trial court sentenced defendant. Defendant’s motion to reconsider sentence was denied and this appeal ensued.

Discussion

Sufficiency of the Evidence

Defendant first asserts that the evidence at trial was insufficient to support his convictions for aggravated rape, aggravated oral sexual battery[10], armed robbery and indecent behavior with juveniles. Regarding the rape convictions, defendant points out that the only evidence that established that defendant committed the crimes was DNA evidence and contends that mistakes could have been made in the DNA testing. Likewise, he asserts that the evidence was insufficient to prove he committed armed robbery. Regarding his indecent behavior convictions, 1qdefendant argues that the presence of the children during their mothers’ rapes was a “coincidence.”
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.04/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
*103 The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.09/25/98), 719 So.2d 610, unit denied, 98-2723 (La.02/05/99), 737 So.2d 747.
This court’s authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const, art. 5, section 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). In cases involving a defendant’s claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentifícation in order to carry its burden of proof. State v. Powell, 27,959 (La.App.2d Cir.04/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.02/21/97), 688 So.2d 520.
1m Aggravated Rape Convictions
As noted above, defendant was convicted of three counts of aggravated rape of three different women. Defendant does not dispute that the three women were in fact raped. Instead, he contends that the DNA evidence was not sufficient proof to convict him. This argument is based solely upon the fact that the crime lab technician, Connie Brown, testified that mistakes “can be” made in testing DNA. According to defendant, this alone creates reasonable doubt.
This court noted the following in State v. Brown, 31,123 (La.App.2d Cir.09/23/98), 719 So.2d 146,149-150:
The results of DNA and RFLP analysis are generally admissible in Louisiana so long as the trial court’s gatekeeping function has been performed in accordance with the Daubert/Foret test. State v. Quatrevingt, 93-1644 (La.02/28/96), 670 So.2d 197, cert. denied, 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1993); State v. Foret, 628 So.2d 1116 (La.1993). This connection is to be examined in light of a preliminary assessment by the trial court of whether the reasoning and methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology can be applied to the facts at issue. Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] supra; State v. Foret, supra. In considering whether scientific evidence is reliable, the trial court should consider the following factors suggested in Daubert: (1) the testability of the expert’s theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the methodology is generally accepted in the scientific community. Daubert, supra; State v. Quatrevingt, supra.
A review of the record reveals that defendant’s DNA sample matched up with the samples obtained from not one, not two, but all three of the crime scenes and victims. Ms. Brown noted that the likelihood of another black male being the contributor of the DNA found at any one of the crime scenes was one in 38.4 trillion. Furthermore, Ms. Brown was very detailed Inin her testimony about the procedures used in the lab for testing DNA evidence and stated that there had never, to her knowledge, been a mixup of samples in the lab. Her explanation of the procedures utilized by the lab showed that the likelihood of such a mixup was very unlikely. This portion of defendant’s first assignment of error is meritless.

Armed Robberg Convictions

Defendant next asserts that the evidence was insufficient to prove that defen *104 dant committed an armed robbery of L.W.[11] According to defendant, the evidence shows that he did not ask L.W. for her ring; she simply gave him the ring because she thought he was there to rob her.
Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La.R.S 14:64; State v. Taylor, 422 So.2d 109 (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983). La.R.S. 14:2(3) defines “dangerous weapon” as any instrumentality which, in the manner used, is calculated or likely to produce death or great bodily harm. During the robbery of L.W., defendant was armed with a gun as he took the ring from L.W.
If property is taken from the victim’s presence by intimidation with a weapon, it is sufficient to sustain a conviction for armed robbery. State v. Rejuge, 300 So.2d 489 (La.1974). To establish robbery, the property must be sufficiently under the victim’s control that, absent violence or | ^intimidation, the victim could have prevented the taking. State v. Thomas, 447 So.2d 1053 (La.1984); State v. Toney, 26,711 (La.App.2d Cir.03/01/95), 651 So.2d 387. The fact that the weapon was not recovered is not a fatal failure of proof. See State v. Toney, supra; State v. Brown, 588 So.2d 1317 (La.App. 2d Cir. 1991), writ denied, 592 So.2d 1298 (La.1992).
In the instant case, the jury heard testimony that defendant held a weapon on L.W. until she surrendered a ring, which he kept, and on C.M. when he took cash from her wallet and checkbook. This evidence, when viewed in the light most favorable to the prosecution, fully supports these convictions. This portion of defendant’s sufficiency assignment of error is without merit.

Indecent Behavior with Juveniles

Defendant asserts that the evidence was insufficient to support his convictions of indecent behavior with juveniles. La.R.S. 14:81 provides that:
Indecent behavior with juveniles is the commission of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person. (Emphasis added.)
The reporter’s comments to La.R.S. 14:81 also shows that this provision covers sexual acts which are less than sexual intercourse as well as indecent sexual displays in the presence of children under the age of 17.
The evidence shows that, in all three rapes, defendant broke into the victims’ homes, in which children were present, with the intention of|1scommitting a sexual offense. The evidence also shows that, on the two assaults which resulted in the indecent behavior charges, defendant raped the women while the children were present in their mother’s bedroom. In both cases, defendant was clearly aware that the children were present; in fact, he made them stay in the bedroom while he assaulted their mothers. In one case, defendant required one son to help his mother urinate into a cup before making both boys, at gunpoint, watch their mother’s rape. In *105 the other ease, defendant made the daughter remain in the very bed in which her mother was being sexually assaulted.
The evidence, viewed in the light most favorable to the state, clearly supports these convictions. This portion of defendant’s assignment of error is without merit.

Denial of Motion to Sever

Defendant was charged with nine counts resulting from four separate break-ins. Defendant filed a motion to sever the counts for separate trials. The trial court did sever count six of the original indictment, but allowed the other counts to remain joined for trial. Defendant asserts that the trial court erred in denying his motion to sever these counts for separate trials and that the consolidation of the charges in one trial was prejudicial to his defense.
La.C.Cr.P. art. 493 provides:
Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan, provided that the offenses joined must be triable by the same mode of trial.
|uLa.C.Cr.P. art. 493.3 provides:
Notwithstanding the provisions of Article 493, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. Cases so joined shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.
This court has upheld the joinder for trial of separate charges for the rape of separate victims. State v. Harris, 33,406 (La.App.2d Cir.05/25/00), 765 So.2d 1230, writ denied, 00-2868 (La.08/24/01), 795 So.2d 322. In Harris, the evidence demonstrated the similarity of the common scheme of the crimes and at trial, the evidence was presented chronologically and evidence as to each crime was presented separately. In affirming defendant’s convictions, this court noted:
The Louisiana Supreme Court, when addressing a defendant’s motion to sever, has held that:
Such a motion is addressed to the sound discretion of the trial court and the court’s ruling should not be disturbed on appeal absent a showing of abuse of discretion. State v. Williams, 418 So.2d 562 (La.1982). According to State v. Washington, 386 So.2d 1368 (La.1980), considerations for the trial court in determining whether prejudice may result from joinder include: whether the jury would be confused by the various counts; whether the jury would be able to segregate the various charges and evidence; whether the defendant could be confounded in presenting his various defenses; whether the crimes charged would be used by the jury to infer a criminal disposition and finally, whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. State v. Celestine, 452 So.2d 676, 680 (La.1984); see also State v. *106 Mims, 478 So.2d 685 (La.App. 2d Cir.1985).
State v. Harris, supra at 1235.
Aggravated rape and armed robbery are felony charges that are necessarily punishable by confinement at hard labor. Aggravated oral sexual battery and indecent behavior with juveniles are felony charges that may be punishable by confinement at hard labor. Under La.C.Cr.P. arts. 493 and 493.2, these charges may be joined in the same indictment or information if they are found to be of the same or similar character or are based on the same act or transaction, or on two or more acts or transactions connected together or constituting parts of a common scheme or plan. In such a case, the charges are all triable by a jury of twelve jurors, ten of whom must concur to render a verdict. See State v. Williams, 00-1850 (La.App. 5th Cir.04/11/01), 786 So.2d 785, writ denied, 01-1432 (La.04/12/02), 812 So.2d 666; State v. Bazile, 99-1821 (La.App. 4th Cir.03/29/00), 757 So.2d 851, writ denied, 00-0955 (La.03/16/01), 782 So.2d 574; State v. Jackson, 99-2195 (La.App. 4th Cir.10/06/99), 746 So.2d 638, writ denied, 99-3178 (La.01/14/00), 753 So.2d 217.
The record shows that these criminal acts occurred in a fairly short period of time and within a two to three mile radius. Also, the manner in which each series of crimes occurred was similar. Evidence for each crime was presented chronologically and separately. The record does not reflect that the evidence was confused in any way and the jury was clearly instructed to consider each count separately. In fact, the jury did find defendant not guilty of one armed robbery charge.
|1fiThe counts were properly tried in one trial. We find no abuse of the trial court’s vast discretion in refusing to grant defendant’s motion to sever. This assignment of error is without merit.

Excessive Sentences

Defendant argues that the sentences imposed were unconstitutionally excessive, particularly in light of the fact that most were ordered to be served consecutively with the other sentences.
Concurrent sentences arising out of a single course of conduct are not mandatory, State v. Pickett, 628 So.2d 1333 (La.App. 2d Cir.1993), writ denied, 94-0348 (La.05/20/94), 637 So.2d 476; State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985), and consecutive sentences under those circumstances are not excessive. State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Williams, 445 So.2d 1171 (La.1984); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987). Among the factors to be considered are the defendant’s criminal history, State v. Ortego, supra; State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986); the gravity or dangerousness of the offense, State v. Adams, 493 So.2d 835 (La.App. 2d Cir.1986), writ denied, 496 So.2d 355 (La.1986); the viciousness of the crimes, State v. Clark, 499 So.2d 332 (La.App. 4th Cir.1986), the harm done to the victims, State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied, 435 So.2d 433 (La.1983); whether the defendant constitutes an unusual risk of danger to the public, State v. Jett, 419 So.2d 844 (La.1982); defendant’s apparent disregard for the property of others, State v. Parker, 503 So.2d 643 (La.App. 4th Cir.1987); and the potential for defendant’s rehabilitation, State v. Sherer, 437 So.2d 276 (La.1983); State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987).
In this case, the trial court stated that its justification for making the sentences consecutive was the extensive criminal history of defendant, which involved his *107 breaking into other people’s homes and the fact that each of the instant crimes “occurred by [defendant] entering someone’s home while the victims were home asleep at night ...” It cannot be said that the trial court’s imposition of consecutive sentences was an abuse of discretion or that the consecutive sentences are unconstitutionally excessive. This assignment of error is without merit.

Conclusion

For the above stated reasons, defendant’s convictions and sentences are affirmed. AFFIRMED.

. Defendant was found not guilty of one count of armed robbery.

. To be served consecutively with the sentence for count one, aggravated rape.

. To be served concurrently with the sentence for count six, aggravated rape.

. To be served consecutively with the other sentences.

. One to be served concurrently, the other consecutively with the other sentences.

. Jessie and Jerome Mosley are defendant's half-brothers; defendant did not live with his brothers, although he occasionally stayed at their house.

. Although not in the evidence presented to the jury, the record reflects that defendant became a suspect after a concerned citizen informed police that she suspected defendant was the rapist because she had overheard him admitting to raping several women. The police found a DNA sample taken from defendant in a 1993 investigation. The sample matched all of the DNA samples obtained from the three rapes.

. At that time, defendant was not questioned about the C.M. rape.

. This burglary occurred on September 16, 1999, at the home of Linda Kingsby.

. Defendant, however, in his brief never elaborated how the evidence was insufficient to support his conviction for aggravated oral sexual battery.

. No mention is made of the sufficiency of the evidence regarding his conviction of count seven, the armed robbery of C.M.