592 So.2d 867 (1991)
STATE of Louisiana, Appellee,
v.
Johnny Lee JAMES, Appellant.
No. 23,211-KA.
Court of Appeal of Louisiana, Second Circuit.
December 20, 1991.
*868 Michael A. Courteau, Monroe, for appellant.
Jerry L. Jones, Dist. Atty., Neal G. Johnson, Peggy Sullivan, Asst. Dist. Attys., Monroe, for appellee.
Before NORRIS, VICTORY and BROWN, JJ.
NORRIS, Judge.
Defendant Johnny Lee James was indicted on one count of aggravated rape. La. R.S. 14:42. A jury found him guilty of forcible rape. La.R.S. 14:42.1. The trial court sentenced him to 20 years at hard labor without benefit of probation, parole or suspension of sentence.
*869 On appeal, James urges in a single assignment that the trial court erred in denying his motion to suppress evidence of photographic lineup identification and subsequent in-court identification. As he has failed to establish that the identifications were not reliable, we find no merit in this assignment, and thus affirm the conviction.

FACTS
At the hearing on James's motion to suppress identifications, the victim testified that at about 9:45 p.m. on February 27, 1990, she left her apartment to walk to the Delta Mini-Mart on DeSiard St. in Monroe. She soon noticed a man walking about 50 feet behind her on the same side of the street. She testified that the man's presence made her nervous, but she relaxed somewhat when she saw that he was dressed nicely.
The store was closed by the time the victim got there, so she turned and began walking back home. She testified that she passed within a foot of the man who had been following her. She stated that she saw his face in the rather "dim" light of a streetlight across the street and recognized him as a man she had seen earlier that evening near a neighbor's apartment. After she passed him, he grabbed her from behind. She fought and screamed until the man pulled her to him, held a knife to her throat and demanded that she quit screaming. During the scuffle, she dropped the keys she was holding and a bag containing a beer she had brought with her from home. A scarf and some hair rollers fell from her head to the ground.
The assailant forced her to go with him to a nearby wooded area. When he told her to lie on the ground, she resisted; he then shoved her down. The assailant raped and performed oral sex on the victim, holding the knife the entire time.
When her attacker finished, the victim ran back to her apartment complex parking lot. Having dropped her keys, she could not get into her apartment. She saw her assailant approaching her in the parking lot, so she ran to a nearby Church's Chicken to call the police, with her assailant in pursuit.
At 10:53 p.m., the Monroe Police Department received a report of a sexual assault. Officer James Tramble initially interviewed the victim. Officer Tramble's report, which was included in the record on appeal, indicates that the victim described her assailant as a black man, over six feet tall, weighing about 180 pounds, with a very dark complexion, short hair and a heavy build. Detective Rick Fisher arrived at the scene shortly thereafter. Looking at Detective Fisher, who is 6'4", the victim stated that her assailant was about that height or taller, with a dark complexion, muscular build and "low hair." She also told Fisher that her attacker was wearing stonewashed jeans, a black sweater or pullover with a color design on it, and a gold necklace.
The victim told Fisher that she had seen this man earlier that day at her apartment complex. She had walked by him as she went to a friend's apartment; he was standing on the steps of another apartment in the complex. The victim later testified that she noticed him particularly because he was a stranger to the neighborhood and he appeared to be trying to get her attention.
Detective Fisher interviewed the resident of the apartment the victim had seen her assailant enter earlier that day. Fisher gave the resident a general description of the man, and asked if he had had any visitors. He responded that Johnny James had visited him.
Detective Fisher brought the victim to the police station some three to four hours after the attack. He prepared a photographic lineup which included color pictures of six men whose appearances were similar. One of these pictures was of Johnny Lee James; it was taken in 1986. The victim studied the photos for a few minutes but was unable to identify anyone. She told Detective Fisher that the men in the pictures were too "light." She later testified that, unlike the men pictured, her assailant had short hair and no facial hair.
*870 Detective Fisher then left the office and returned some ten minutes later with a black and white photograph of James taken in 1980; identifying remarks on the picture were covered with tape. Without comment, he placed the picture on his desk in front of the victim. Detective Fisher testified that she looked at the picture and immediately "started screaming, became very upset." R. p. 88. Although she thought Detective Fisher had brought more than one photograph, she positively identified Johnny James as her assailant.
The victim testified that she saw her assailant again about two weeks later when he tried to break into her apartment. (The pre-sentence investigation report states that she called the police on March 15 to report that James had cut her phone lines and broken out her living room window. He ran away when she threw a frying pan at him. The record contains no indication of any charges filed in this matter.)
James was arrested on March 25, 1990 and indicted on one count of aggravated rape. Counsel filed a motion to suppress the identification from the photographic lineup and any subsequent in-court identifications. After the hearing, the trial court noted that sufficient facts were adduced to establish the reliability of the identification, even though placing one picture of the defendant on the desk in front of the victim may have been a suggestive procedure. The court ruled that James had not met his burden of establishing a substantial likelihood of misidentification, and thus denied his motion. James now claims that this ruling was in error, urging that the procedures used in the photographic identification process were unduly suggestive.

DISCUSSION
To prove a violation of due process, a defendant seeking to suppress an identification must first show that the identification procedure was unnecessarily suggestive and, second, that there was a substantial likelihood of misidentification. Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Lowenfield, 495 So.2d 1245 (La.1985). In general, one-on-one photographic identifications ("showups") are not favored; nevertheless, whether an impermissibly suggestive identification occurs depends on all of the circumstances. State v. Johnson, 333 So.2d 223 (La.1976); State v. Lewis, 478 So.2d 665 (La.App. 2d Cir.1985). Admitting evidence of a suggestive identification procedure does not violate due process if the identification is reliable. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Guillot, 353 So.2d 1005 (La.1977); State v. Mims, 501 So.2d 962 (La.App. 2d Cir.1987).
A tainted pretrial identification does not render a subsequent in-court identification inadmissible if the in-court identification is reliable and has an independent basis. State v. Winn, 412 So.2d 1337 (La. 1982).
Any defects in procedure which do not offend the defendant's due process rights go to the weight, rather than the substance, of the evidence submitted to the jury. Manson v. Brathwaite, supra.
As the trial court noted, placing a single photograph before the victim was a suggestive procedure. Certainly, a new display of several black and white photographs of men answering James's description would have been preferable. While creating a new display would have been time-consuming, and Detective Fisher testified that the victim was already understandably upset, the "necessity" for a one-on-one show-up in this case does not rise to the level present in cases where a witness may soon become unavailable. It is true that Detective Fisher did not tell the victim where he was going when he left the office, or for what purpose. He made no comment to her when he returned with the black and white picture, and she reacted immediately to it. Nevertheless, we conclude that the photographic identification procedure used here was impermissibly suggestive. See Hudson v. Blackburn, 601 F.2d 785 (5th Cir.1979), cert. denied 444 U.S. 1086, 100 S.Ct. 1046, 62 L.Ed.2d 772 (1980); State v. McLeland, 456 So.2d 633 *871 (La.App.2d Cir.), writ denied 461 So.2d 312 (1984). This conclusion does not end our inquiry, however.
In Manson v. Brathwaite, supra, the U.S. Supreme Court concluded that the "linchpin" in determining the admissibility of identification testimony is its reliability. Factors useful in determining reliability include (1) the witness's opportunity to see the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and, (5) the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification. See also State v. Davis, 409 So.2d 268 (La.1982).
Applying the Manson factors to the present case we find that the identification procedure did not produce the likelihood of misidentification. First, the victim had several opportunities to see James. She first saw him at her apartment complex several hours before the attack. She recognized him later when he followed her to the store. Even though the light from the streetlight across the street was "dim," she saw him clearly when she passed him and when they struggled by the street before he dragged her into the woods. She saw his face at close range during the rape. When he pursued her to her apartment parking lot, she recognized him and ran away. Each of these observations was of sufficient duration to support the reliability of her subsequent identification. We further note that the victim recognized her rapist some two weeks later when he tried to break into her apartment.
Second, unlike a casual witness, this rape victim had no choice but to pay close attention to her attacker during the assault. She testified that his face was no more than a foot from hers and that she could never forget it. In addition, she testified that when she saw James earlier in the day, she noticed him particularly because he was a stranger to the neighborhood and he seemed to be trying to get her attention. The evidence is sufficient to show the requisite degree of attention for the identification. Cf. State v. Prudholm, 446 So.2d 729 (La.1984).
Third, the victim gave both Officer Tramble and Detective Fisher detailed descriptions of her attacker shortly after the attack. She described his skin color, hair style, build and clothing; the clothing she described, including the gold necklace, was found among James's belongings when he was arrested. She told Detective Fisher that her assailant was his height or taller; Fisher is 6'4", while James is 6'3". Her assessment of James's height was thus very accurate.
Fourth, the victim's level of certainty in her identification of the black and white photograph was very high. She gave a reasonable explanation for her failure to select James in the photo lineup, adding that his "light" photo also showed him with facial hair and long hair, which he did not have on the day of the rape. When she saw the black and white picture, even though it was an older photograph, she immediately and positively identified the man pictured. Detective Fisher testified that she became very upset as soon as she saw the photograph.
There is no question that the fifth Manson factor is satisfied, as the victim identified her assailant within a few hours of the rape. The victim's spontaneous identification, made shortly after the attack, is strongly indicative of a reliable identification and undermines James's claim of misidentification. We thus find that the Manson factors are amply satisfied on this record.
Among the cases James cites in support of his position is State v. Jackson, 454 So.2d 398 (La.App. 4th Cir.1984), in which the court found that giving a witness a two-view mug shot of the defendant only was impermissibly suggestive and created substantial likelihood of misidentification. The facts in Jackson, however, were quite different from those presented here. The witness in Jackson never gave a description of the defendant to the police, the witness's degree of certainty at the photographic *872 show-up was not apparent from the record, and, most importantly in the appellate court's opinion, the photo I.D. took place eight months after the crime. The pronounced deficiencies in the reliability factors in State v. Jackson distinguish it from the instant case.
Considering the totality of circumstances, we find that the photo identification procedure used in this case, while suggestive, nevertheless produced a reliable identification. The trial court did not err in admitting this evidence for the jury's consideration.
We likewise find that the trial court did not err in allowing in-court identification. Even where a pretrial identification is unreliable, due process is satisfied if the in-court identification has a basis independent of the tainted procedure. State v. Winn, supra. In State v. Newman, 283 So.2d 756 (La.1973), cert. denied 415 U.S. 930 (1974), the court enumerated three factors to be considered in determining whether an in-court identification has an independent source: (1) any prior acquaintance the witness had with the accused; (2) the length of time the witness observed the perpetrator before, during and after the commission of the offense; and (3) the circumstances under which the observation was made, including lighting at the scene, the physical capacities of the witness, and the witness's emotional state at the time of the observation. 283 So.2d 756 (La.1973). Here, the victim had more than ample opportunity to observe her assailant before, during and after the attack. She saw him at her apartment complex, she recognized him when he followed her to the store, and she was certainly close enough to see him clearly when he grabbed her, even in the relatively dim light of the streetlight. She was face to face with him during the rape. She saw him again in the apartment parking lot after the attack and once more when he tried to break into her home.
At the hearing, the victim stated unequivocally that Johnny James was the man who raped her. She testified that her in-court identifications (at the suppression hearing and an earlier hearing on motion to reduce bond) were in no way influenced by the photos she had seen earlier. She stated that she could have identified James without ever having seen a photograph.
Given the strength of the victim's testimony and the circumstances of the offense, the likelihood of misidentification was minimal. The victim positively identified James as the man who stalked her, raped her and later broke into her home. The trial court did not err in allowing the jury to hear evidence of both in- and out-of-court identifications.
For the reasons expressed, we find no merit in James's assignment. We have also reviewed the record designated for appeal and find nothing we consider to be error patent. La.C.Cr.P. art. 920(2). The conviction and sentence are affirmed.
AFFIRMED.