JiHIGHTOWER, Judge.
A unanimous jury found defendant, George Cheathon, guilty of one count of attempted public bribery, La. R.S. 14:118 and 14:27, and one count of malfeasance in office, La. R.S. 14:134. The latter conviction resulted in a sentence of three years at hard labor, probated for five years with special conditions demanding thirty days in jañ and payment of a $1,000 fine, while the other conviction culminated in a concurrent eighteen-month term of hard labor incarceration, suspended during two years of supervised probation requiring, inter alia, payment of a $250 fine. Defendant now appeals, reserving five assignments of error. For the reasons hereinafter expressed, we affirm.

FACTS

On March 12, 1990, Cheathon, a transportation enforcement officer with the Louisiana Public Service Commission (“PSC”), worked at the eastbound scales (“Delta Scales”) on I-20 near Tallulah implementing statutes that direct interstate carriers to possess uniform cab identification cards, commonly called “bingo stamps,” as evidence of proper registration and insurance. See La. R.S. 45:163.1(A)(2). When four trucks owned by Hawkeye Motors of Florida approached, the first two proceeded through the checkpoint without incident, while the station signaled the vehicles driven by William Antonio Sircel and Larry Augustad to stop. Although Cheathon soon found their paperwork to be insufficient and that two $115 fines should result, both operators attempted to justify an exemption from the bingo card requirement based upon the company’s private ownership of the cargo.
Despite rejecting that explanation, Chea-thon indicated the pair could leave the scales without penalty if they “would help buy us lunch.” Reluctantly agreeing after a short discussion, Augustad reached for his wallet but Cheathon warned against conducting the transaction in the open. The driver then climbed into his vehicle and cautiously gave the officer a $20 bill. Cheathon, next turning to Sircel, requested that he also buy him lunch. After the second operator similarly handed over a $20 bill, both trucks departed.
|2Upon crossing the Mississippi state line, the victims contacted authorities. Eventually, Sircel and Augustad returned to Louisiana in order to meet with a state trooper who elicited statements and descriptions. The ensuing police and PSC investigations identified Cheathon as the perpetrator. Charged with public bribery and malfeasance in office, defendant proceeded to trial on October 31, 1994.

Assignment of Error No. 1

In this first assignment of error, defendant complains about the introduction of portions of a statement made by him to a state trooper, arguing these declarations im-permissibly mention other crimes. The admitted evidence reads as follows:
The scope of my duties are to cheek trucks for insurance bingo cards. If they are in violation, I cite them, and they pay for ticket [sic] by either cash or Comcheck. I was probably working on March 12, 1990. I always work on the eastbound side of the scales here on 1-20. I have no recollection of any Hawkeye trucks or any problems that I might have had with them. I always keep the ticket books of tickets written, *825 but I don’t recall any tickets -written to Hawkeye.
* * * * * *
I may have accepted lunch from some trucker, but I doubt it. I’ve never asked a trucker to buy from me lunch for not to write them a ticket.
Through the testimony of the trooper, the state attempted to have Cheathon’s entire statement introduced into evidence. Even so, upon objection, the court excised those portions referring to other crimes but admitted the remainder noted above. Still, defendant insists that the last two sentences constitute “other crimes” evidence. He is, however, mistaken.
Instead, the two declarations set forth a denial of criminal activity. Cheathon first expresses doubt as to having accepted lunch from any truck driver and then flatly denies ever requesting that an operator purchase him lunch in order to avoid a ticket. The defendant’s intended message is readily apparent. He indicates that, if indeed he had ever accepted lunch from a truck driver, it did not occur in exchange for his failure to write a ticket. Thus, in the statement, Chea-thon admits committing no acts of public bribery or other crimes. That being so, we find defendant’s contentions without merit.

IsAssignment of Error No. 2

In a related assignment, Cheathon maintains that the district court erroneously ruled he could be impeached with the inadmissible portion of his statement should he take the stand, thereby depriving him of the right to testify in his own defense.[1] Here again, defendant misunderstood both the argument of the state and the ruling of the trial judge.
Cheathon argued at trial that, if he testified, the state should not be allowed to impeach him with the inadmissible portion of his earlier statement. The state countered that, if Cheathon testified in a manner inconsistent with his prior disclosure, he could be impeached with the otherwise excluded evidence. The district judge replied, “[T]he understanding of the Court is that such statements could be, could, in fact, be used to impeach the testimony of the witness.” Hence, the court intended to admit the statement to impeach Cheathon only if he testified in a manner inconsistent with that statement. Consequently, in that this accords with La. C.E. Art. 607(D)(2), the assignment of error fails.

Assignment of Error No. 3

In his third assignment, defendant contends that the trial court erred in allowing the PSC director of transportation to testify as to what an inspector in Cheathon’s capacity should not do. Cheathon urges the irrelevancy of the evidence and, in the alternative, that it should have been excluded due to the danger of unfair prejudice or confusion of the issues. This argument lacks merit.
Proof of public bribery, in this instance, required a showing that a public employee accepted something of present or prospective value with the intent to influence his conduct in relation to his position. La. R.S. 14:118(A)(2). As for the charge of malfeasance in office, the state faced a requirement of proving that a public officer or employee either intentionally refused or failed to perform some duty lawfully required of 14him in his capacity as such officer or employee, or that he intentionally performed any such duty in an unlawful manner. La. R.S. 14:134. Thus, in establishing either crime, evidence that Cheathon acted inappropriately became necessary and relevant to show the requisite intent to influence his conduct and delineate the scope of the “duty lawfully required” of him, or the performance of that duty in an unlawful manner. Defendant similarly fails to demonstrate how the negative testimony unfairly prejudiced him or confused the issues. We thus find no error in the trial court ruling.

Assignment of Error No. U

In his fourth assignment of error, defendant complains that his in-court identifica *826 tion, by Sircel and Augustad, should have been suppressed as “tainted” by an out-of-court identification before Robert Rieger, Jr.
After learning of the investigation by state police, the Louisiana Public Service Commission directed its general counsel, Rieger, to probe the allegations in light of pending civil litigation involving Cheathon’s claims for unemployment compensation and wrongful termination. In early 1991, that attorney traveled to Florida to confer with Sircel and Augustad. From a seven-photo display prepared by Rieger in anticipation of the meeting, both drivers independently identified defendant as the perpetrator. Afterwards, the legal adviser returned the photographs to the departments from which they had been borrowed. At trial, Rieger testified that he no longer knew the location of the pictures and had never intended to use the lineup for criminal trial purposes.
Despite defendant’s argument that losing the pictures precluded a fair determination of the suggestiveness of the identification, the law is clear that the loss of photographs used for identification does not violate due process absent a showing of bad faith on the state’s part. State v. Lindsey, 543 So.2d 886 (La.1989), cert denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798, reh’g denied, 495 U.S. 966, 110 S.Ct. 2579, 109 L.Ed.2d 761 (1990). In the matter at hand, Rieger testified about his obligation to return the photographs to the departments from which they had been obtained, and also attested to his use of the lineup for PSC purposes only. Additionally, |5he never discussed the matter with law enforcement officials. The evidence, then, fails to demonstrate the state’s bad faith.
Nor did the trial court err in failing to find the lineup suggestive. Beyond that, to suppress an identification on such grounds, the defendant must prove both the procedure involved to be impermissibly suggestive and that the totality of the circumstances presented a substantial likelihood of irreparable misidentification. State v. Martin, 595 So.2d 592 (La.1992); State v. Harris, 28,517 (La.App. 2d Cir. 08/21/96), 679 So.2d 549. In evaluating whether the reliability of an identification may outweigh the suggestiveness of the procedure employed, courts are directed to consider several factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness’s degree of attention; (3) the accuracy of the witness’s prior description of the criminal;' (4) the level of certainty demonstrated at the confrontation; and (5) the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Harper, 93-2682 (La. 11/30/94), 646 So.2d 338; State v. Harris, supra.
In the present case, even if we disregard the contrary evidence and assume ar-guendo that the pre-trial identification represented an impermissibly suggestive activity, the record discloses an independent basis for admitting the in-court identifications by the two victims. Sircel testified he spent a maximum of five minutes on the opposite side of the counter from Cheathon inside the Delta Scales building, and that ten or fifteen minutes elapsed during their conversations outside the building. Nothing obstructed his view of the enforcement officer who approached his truck and insisted upon receiving payment. In fact, the two “stood eye-to-eye” during the exchange of the cash. Similarly, Augustad spent five to eight minutes inside the building with Cheathon, and approximately fifteen minutes outside.
Thus, for an extended period of time and at close range, both victims had an opportunity to view and pay considerable attention to the perpetrator. Shortly after the incident, they both described Cheathon in detail. Those similar depictions, given ^independently, accurately reflected defendant’s general appearance and facilitated his identification by the state trooper. Adding an even greater degree of reliability to the Isignation is the fact that only two persons, possessing greatly differing physical features, worked at the location on the day in question. Furthermore, neither driver demonstrated any uncertainty concerning their conclusion. Sircel remained “one hundred percent” sure about his identification of defendant, and Augustad asserted no possibility of confusion.
*827 An in-court identification, even when preceded by a suggestive pretrial identification, does not constitute reversible error so long as there is not a “very substantial likelihood of irreparable misidentification.” State v. Martin, supra (quoting Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968)). For that reason, a tainted pretrial identification does not render a subsequent in-court identification inadmissible, if the in-court identification is reliable and has an “independent source.” State v. James, 592 So.2d 867 (La.App. 2d Cir.1991). As previously indicated, although over four years elapsed in the present matter between the original description and trial, a highly reliable identification emerges from the total circumstances shown, including the extended intense observation of Cheathon and the high level of certainty maintained by the witnesses at all times. Thus, this assignment lacks merit.

Assignment of Error No. 5

Cheathon finally argues that conducting the photo lineup without his attorney present effectively violated his constitutional right to counsel.
That right attaches, however, only after the commencement of adverse judicial proceedings. State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367. Importantly too, neither the Sixth Amendment to the United States Constitution nor Article I of the Louisiana Constitution grant the right to counsel at pretrial, post-indictment photographic lineups conducted for the purpose of allowing a witness to identify the perpetrator of a crime. United States v. Ash, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); State v. Stewart, 389 So.2d 1321 (La.1980). Obviously then, no such right exists where the defendant has yet to be indicted. Id.
Here, the photographic lineup transpired in 1991, long before the filing of the bill of information in 1994. Under these facts, Cheathon cannot claim a denial of his constitutional right to counsel, even if we assumed that Rieger acted for the state in its law enforcement capacity.

Assignments of Error Nos. 6, 7, and 8

Defendant has explicitly abandoned these assignments of error. See State v. Scott, 27,104 (La.App.2d Cir. 6/21/95), 658 So.2d 251.

CONCLUSION

For the foregoing reasons, defendant’s convictions and sentences are affirmed.
AFFIRMED.

. In brief, the state reveals that the initial discussion regarding impeachment with the inadmissible portion of the statement took place during an in camera conference between counsel and the trial judge. Although the content of that conversation is not before us, the record contains the subsequent courtroom exchange.