786 So.2d 203 (2001)
STATE of Louisiana, Appellee,
v.
Michael WILLIAMS, Appellant.
No. 34,359-KA.
Court of Appeal of Louisiana, Second Circuit.
May 9, 2001.
*207 Walter F. Clawson, Shreveport, Counsel for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Catherine M. Estopinal, Edwin L. Blewer, II, Assistant District Attorneys, Counsel for Appellee.
Before BROWN, CARAWAY and DREW, JJ.
CARAWAY, J.
The defendant was originally charged as a principal to a second degree murder which occurred during the course of an armed robbery. Defendant was found guilty of the responsive verdict of manslaughter after a jury trial. The trial court sentenced defendant to thirty years at hard labor without the benefit of probation, parole, or suspension of sentence. The trial court denied defendant's motions for post-verdict judgment of acquittal and for reconsideration of sentence. Defendant challenges the sufficiency of the evidence used to convict him, as well as the admissibility of other evidence. He further argues that his sentence is excessive. For the following reasons, defendant's conviction and sentence are affirmed.

Facts
On August 11, 1995, between 9:00 and 10:00 p.m., defendant, Michael Williams ("Williams"), his brother, Elbert Williams ("Elbert"), and their cousin, Bobby "Bug" Hampton ("Hampton"), approached Kelvin Fields (also referred to as Kevin Phill, but hereinafter referred to as "Fields"). Fields was Williams' former neighbor. The three men asked Fields to take them "somewhere." Fields refused, but later that night, he let them borrow his car. Fields was unsure of the exact time that the men returned the car, but stated that it could have been after 1:00 a.m.
On Saturday, August 12, at about 1:00 a.m., employees of a liquor store at Monkhouse and Greenwood Road in Shreveport were preparing to close the business for the night. Three black males, who appeared to be customers, were present. One of the perpetrators, later identified as Hampton, bought snacks from the cashier, Collette Shinberger ("Shinberger"). A second employee, Russell Coleman ("Coleman"), was sitting at the turnstile near the store's entrance. The third employee, Franklin Tesnear ("Tesnear"), was at or near the stock room.
As Hampton left the counter, shots rang out. Coleman was struck by the bullets. Hampton told Tesnear to move toward him and then to lie on the ground. Williams, who was later described by Tesnear as "the young, short, skinny one," was at Shinberger's register with Elbert. Williams was 16 years old at the time. Elbert and Williams took cash from both registers, while Hampton forced Tesnear to break into the manager's office. The men stole about $12,000 in cash and several bottles of liquor. During the robberyhomicide, Williams did not try to stop the other men. Williams neither ran away, nor did Williams try to help Coleman after he was shot.
*208 The police responded and found that Coleman was shot three times in the back while he sat facing the door. Tesnear testified that only Hampton was in a position to shoot, since the Williams brothers were off to the side of Coleman, not behind him.
The robbers fled to the house of a friend, Paula Robinson ("Robinson"). According to both Sandra Lucky ("Lucky") and Kendra Williams ("Kendra"), Hampton was carrying a brown paper bag. The men hid in a back room where they apparently divided the money and liquor. The robbers gave Robinson and her cousin, Neshondra, a full, sealed bottle of gin to get the girls to leave them alone. When the three came out of the back room, Williams was carrying a bag which contained "a whole bunch of money."
The three men asked Lucky to give them a ride to a pharmacy and to their home. During the trip, Lucky asked the men for money for gasoline. Elbert told her "they had about $4,000 a piece on them" and gave her five dollars. Lucky also had an opportunity to look at the bag Williams was holding, and testified that the bag was full of money.
Later that day, each robber bought a car and paid cash, using the names of friends or relatives on the vehicles' titles. Williams worked out a deal to buy a '78 or '79 Cadillac Coupe Deville for $1,100. He initially put the car in the name of Kevin Morris ("Morris"). Morris testified that he accompanied Williams to buy the car, and he observed that Williams was carrying a large amount of cash.
Williams called Morris on Sunday and apologized for getting him involved. Williams admitted to Morris that he participated in the robbery of the liquor store, and that Hampton shot someone. Williams also told Morris that he kept $4,186, and that Hampton and Elbert received similar amounts. At trial, Morris stated that he feared for his life for having to testify about the Williams brothers' participation in the crime.
Further investigation, including a description of the robbers' vehicle and a telephone tip from Lucky, led the police to suspect Williams, Elbert, and Hampton. The police executed a search warrant at Williams' home. A jacket was found in Williams' room which contained $460 hidden in the jacket's lining. The Williams brothers turned themselves in the next day; Elbert was arrested that day, and Williams was arrested a few days later.
At trial, Tesnear testified he took note of Williams prior to the robbery, because Williams was too young to be in a liquor store. Tesnear identified Hampton and Elbert from photographic lineups. He identified Williams from a videotaped lineup.
Williams presented alibi evidence through the testimony of his neighbors and family members, indicating that he was at a party at the neighbor's home after 7:30 p.m. on the evening of August 11, until approximately 12:30 a.m., August 12. Williams' father also testified that he gave Williams $500 cash for his birthday and for school clothes; further he testified regarding Williams' work during the summer months preceding the crime.
Elbert testified, against his attorney's advice, and stated that he was convicted at trial on two counts of armed robbery and one count of second degree murder, all of which arose from this incident. Elbert also stated that on the night in question, he went out with Fields and Hampton to get a pizza. They returned to the Williams' home. Elbert testified that Williams came home at about 12:20 a.m. Elbert then woke his sister about 2:00 a.m. and asked her to drive him, Williams and Hampton to a *209 friend's home on Hollywood. According to Elbert, the Williams brothers stayed at the Hollywood home.
Elbert denied giving money to Lucky that night. He denied telling her that he and Williams had $4,000 each. Elbert also testified that none of them ever spoke with Fields about borrowing his car.
On appeal, Williams assigns seven errors regarding his conviction and sentence for manslaughter.

Discussion
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.

Sufficiency of the Evidence
Manslaughter, as a responsive verdict to second degree murder, is a homicide committed, without any intent to cause death or great bodily harm when the offender is engaged in, inter alia, armed robbery, first degree robbery or simple robbery. La. R.S. 14:31; La.C.Cr.P. art. 814(A)(3). All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals and are thus parties to the crime. La. R.S. 14:23; La. R.S. 14:24.
Williams argues that the State failed to prove that he was in the liquor store when the crime occurred. The defense contends the only evidence to link Williams to the crime was Tesnear's identification of the defendant, and that Tesnear's testimony was inconsistent. The inconsistencies asserted by the defense are: (1) Tesnear changed his identification of the shooter from Elbert to Hampton; and (2) Tesnear changed his versions of where Hampton encountered him from the stock room door to the front of the store. The defense further suggests that these inconsistencies, coupled with Williams' alibi witnesses, demonstrates a lack of meaningful corroboration of Tesnear's identification of Williams as one of the robbery participants. We disagree.
There was no inconsistency in Tesnear's testimony regarding Williams' participation in the crime, and Tesnear's identification of Williams was certain. Additionally, the testimony of Fields regarding Williams and his accomplices' use of his car is contrary to Williams' alibi. Moreover, Williams' admission to Morris regarding his involvement in the robberyhomicide and his share of the robbery proceeds is further evidence of guilt. This evidence, viewed in the light most favorable to the prosecution, is sufficient to prove that Williams is guilty as a principal to second degree murder and armed robbery, and certainly sufficient to prove guilt beyond a reasonable doubt on the lesser included offense of manslaughter. This assignment lacks merit.

Suppression of Identification
Detective James Muller ("Detective Muller") testified that he developed Hampton, Elbert and Williams as suspects in *210 this case. Tesnear noticed Williams, because he thought Williams was too young to be in a liquor store. Tesnear described defendant as a young and short man with "puffy" hair. Detective Muller prepared a videotaped lineup, including defendant "and five other youthful looking subjects similar in appearance to him." Tesnear positively identified Williams from the videotape. Tesnear also positively identified Williams' accomplices from photographic lineups. In each instance, Detective Muller told Tesnear that he was not under pressure to pick anyone, and that the suspect may or may not have been shown in the lineup.
The trial court ruled that the lineups were properly prepared. There were no suggestive measures in connection with the lineups. The court denied defendant's motion to suppress identification.
The defense argues that Tesnear, who identified defendant from a videotaped lineup at the juvenile justice complex, inexplicably walked into a courtroom prior to the lineup, where defendant was present and saw the back of defendant's head. Tesnear was immediately asked to leave the courtroom. The defense concludes that the lineup itself was "tainted," since Tesnear had the opportunity to view Williams immediately before he was shown the video lineup. Williams further argues that Tesnear admitted at trial that he noticed that the person in the juvenile courtroom had a distinctive hairstyle. Without any supporting evidence or jurisprudence, the defense claims that the identification should be suppressed, because the State failed to take necessary security precautions to keep Tesnear out of the courtroom.
The State argues that Tesnear recognized Williams by his distinctive hairstyle, and that Tesnear's identification of Williams is bolstered by his identification of the other two defendants. Other witnesses also linked the three robbers together before and after the crime; thus, the State concludes that the lineup was untainted and reliable.
In seeking to suppress an identification, the defendant must prove the procedure used was suggestive and that the totality of the circumstances presented a substantial likelihood of misidentification. State v. Martin, 595 So.2d 592 (La.1992); State v. West, 561 So.2d 808 (La.App. 2d Cir.), writ denied, 566 So.2d 983 (La.1990). The U.S. Supreme Court has approved several factors for evaluating whether the reliability of an identification may outweigh the suggestiveness of the procedures employed. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Davis, 27,961 (La.App.2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12. The factors are: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the victim's prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. Accord, State v. Cheathon, 28,741 (La.App.2d Cir.10/30/96), 682 So.2d 823, 826-27, writ denied, 96-2883 (La.5/1/97), 693 So.2d 742.
In this case, Tesnear and Williams were in a well-lit store. Tesnear's job included watching people in the store to prevent shoplifting. He quickly noticed Williams because of his build and young age, and he accurately described those characteristics in advance of the video lineup. Tesnear paid very close attention to the robbers' activities. He positively identified all three defendants without hesitation. The time between the crime and the videotape *211 lineup was less than one week. Tesnear recalled defendant's distinctive hair style as being a factor in his identification. The defense failed to show that the lineup was unduly suggestive, or that the in-court look at the back of defendant's head could have contributed to a misidentification. Nor is there evidence that the State orchestrated a plan to allow Tesnear to view Williams immediately prior to the lineup. Therefore, this assignment of error likewise lacks merit.

Challenge for Cause
In the next assignment of error, Williams argues that the trial court committed two errors: (1) that the trial court erred when it granted one of the State's cause challenges; and (2) that the trial court erred when it failed to grant a defense challenge for cause.
Regarding the first challenge, the State used only eight of the twelve peremptory challenges afforded under La. C.Cr.P. art. 799 before the jury was empaneled. Therefore, in accordance with La.C.Cr.P. art. 800 "the erroneous allowance to the State of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of the ruling is the exercise by the State of more peremptory challenges than it is entitled to by law." Since the trial court's alleged error did not afford the State more than the twelve challenges the State is entitled to by Article 799, this alleged error does not give rise to a claim for relief. Whether or not the court erred is not material under these circumstances, since the State did not gain an extra peremptory challenge. State v. Hattaway, 28,060 (La.App.2d Cir.5/8/96), 674 So.2d 380, 386, writ denied, 96-1900 (La.1/10/97), 685 So.2d 141. This part of the assignment is therefore without merit.
Williams asserts in the second part of this assignment that the trial court improperly denied his challenge for cause of Juror Crawford.[1] Juror Crawford stated that she "might tend" to believe a police officer's word over a civilian if their testimonies "were both exactly the same." In support of his argument, Williams cites State v. White, 574 So.2d 561 (La.App. 3d Cir.1991), which held the denial of a defense challenge for cause of a juror who would believe a police officer over a civilian, without rehabilitation, to be reversible error.
To establish reversible error on a denial of a challenge for cause, a defendant need not only demonstrate an erroneous ruling, but also that he exhausted his peremptory challenges before completion of the jury panel. State v. Smith, 31,955 (La.App.2d Cir.5/5/99), 740 So.2d 675, 684, writ denied, XXXX-XXXX (La.2/16/01), 785 So.2d 841 (citations omitted). "The trial court is vested with broad discretion in ruling on a challenge for cause; such rulings will be disturbed only when review of the entire voir dire reveals an abuse of discretion." State v. Hattaway, supra, 674 So.2d at 385 (citations omitted).
A refusal by a trial judge to excuse a prospective juror on the ground that he is not impartial is not an abuse of discretion where, after further inquiry or instruction (frequently called "rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278; State v. *212 Harris, 33,406 (La.App.2d Cir.8/25/00), 765 So.2d 1230, 1236-37.
Our review of the record shows that after Juror Crawford made the complained of statement, the court asked, and she agreed, that she would not disregard other evidence if a police officer testified, and that she would consider and weigh all the evidence equally. Juror Crawford also agreed that she would consider each witness's testimony and demeanor and would not weigh one against another because of their positions. The trial court properly rehabilitated Juror Crawford and properly denied defendant's challenge for cause. This part of the assignment also lacks merit.

Defendant's Presence at Bench Conferences
In this assignment, the defense notes that the record does not show that Williams was present at the bench during bench conferences. Williams relies on broad, generalized statements of law to arrive at this specific challenge of a timehonored procedure in American court proceedings. The defense does not cite any authority which is on point to support this argument. Also, neither defense counsel nor Williams ever raised the issue by objection at any time during the trial.
La.C.Cr.P. art. 831 provides, in pertinent part, as follows:
A. Except as may be provided by local rules of court in accordance with Articles 522 and 551, a defendant charged with a felony shall be present:
(4) At all times during the trial when the court is determining and ruling on the admissibility of evidence.
There is no jurisprudence, or specific statutory provision that requires the defendant's presence at a bench conference in order to satisfy Article 831. State v. Wesley, 33,402 (La.App.2d Cir.5/10/00), 759 So.2d 286; State v. Glover, 93-959 (La.App. 5th Cir.3/29/94), 636 So.2d 976, writ denied, 94-1460 (La.9/3/96), 678 So.2d 544, writ granted in part and remanded, 97-1474 (La.12/19/97), 704 So.2d 242. "Presence of the defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." State v. Kahey, 436 So.2d 475 (La.1983); State v. Wesley, supra. In certain instances, presence of defense counsel may be sufficient to satisfy the statutory requirement of presence of the defendant at important stages of trial. State v. Wesley, supra.; State v. Smith, 587 So.2d 62 (La. App. 4th Cir.1991); State v. Grissom, 448 So.2d 757 (La.App. 2d Cir.1984); State v. Lane, 414 So.2d 1223 (La.1982). The right to be present may be waived by the defendant or by his attorney, or by defendant's voluntary absence or his failure to assert an objection to a discussion held in his absence. State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218; State v. Kahey, supra; State v. Lane, supra.
The merits of this assignment are not supported by any jurisprudence cited by the defense. Further, defendant failed to make a contemporaneous objection. Moreover, the participation of Williams' attorney during these discussions, as well as Williams' continuous presence in the courtroom, are sufficient to provide the constitutional protection mandated by La. C.Cr.P. art. 831. State v. Wesley, supra. The trial court's determinations and rulings on the admissibility of evidence were sufficiently reflected on the record, and thus rendered in the presence of the defendant, despite the informal discussion between the trial court and counsel during the bench conferences. Id. Therefore, this assignment is without merit.

Rebuttal Testimony
Williams next argues that the trial court erred when it allowed the State *213 to call Elbert's attorney, John Michael McDonald ("McDonald"), as a rebuttal witness. The defense claims that the assistant district attorney improperly questioned Elbert regarding matters protected by the attorney/client privilege, and that although Elbert did not expressly assert the privilege, his testimony did not amount to a waiver of his attorney/client privilege.
The defense called Elbert to testify as an alibi witness on Williams' behalf. Elbert was accompanied by his attorney, McDonald. The trial court excused the jurors and then questioned both Elbert and his attorney. McDonald told the trial court that he advised Elbert, who had previously been convicted, but not yet sentenced, of second degree murder and two counts of armed robbery, that it would be in his best interest to claim his 5th Amendment right. McDonald also explained that Elbert elected to testify on his brother's behalf, despite his recommendations. The trial court then questioned Elbert separately and advised Elbert of his 5th Amendment right not to testify.
After the jury returned to the courtroom, Elbert testified regarding the actions of Williams, himself, and others in the early morning hours of August 12. He stated that at the time the robbery occurred he, his mother, Rita, his sister, Kendra, his daughter and his brother, Kevin, were all at Rita's home with Williams. Rita, Kevin and Kendra also testified regarding this alibi, and Rita stated that she called Elbert's attorney, McDonald, on several occasions regarding this alibi prior to Elbert's trial. Rita testified that no one from McDonald's office ever returned her phone calls, nor did anyone interview her.
On cross-examination, Elbert admitted his convictions. Later in the State's crossexamination, the following colloquy took place:
Q. Okay. Did you discuss the case with your Lawyer?
A. It was in confidential (sic) between me and him.
Q. I'm not asking you what you said. I just asked if you discussed the case.
A. I discussed the case with my Lawyer.
Q. Okay. And did you tell him about those five people that could alibi you?
A. Right.
Q. You did tell him that?
A. Right.
At that point, defense counsel asked to approach the bench. A bench conference was held, but no specific objections were made regarding the assistant district attorney's line of questioning.
After the defense rested its case, the State called McDonald as a rebuttal witness. McDonald was first questioned outside the jury's presence and attempted to assert the attorney/client privilege regarding Elbert's identification to him of the alibi witnesses prior to Elbert's trial. The trial court ruled that the attorney/client privilege regarding that information had been waived. When the jury returned to the courtroom and McDonald's testimony was presented, McDonald again asserted the attorney/client privilege when asked if Elbert previously named the Williams family members as being able "to verify his [Elbert's] whereabouts at the time of the crime." The trial court found the privilege waived and overruled the objection. Defense counsel also objected, which was likewise rejected by the trial court. McDonald answered that Elbert did not tell him the same names as potential alibi witnesses. Elbert did provide names of potential *214 alibi witnesses, but not the names he mentioned in Williams' trial.
The attorney/client privilege is set forth in La. C.E. art. 506(B) and provides that the "client has a privilege to refuse to disclose ... a confidential communication" made to the client's lawyer. This privilege is purely personal in favor of the client. State v. Green, 493 So.2d 1178 (La.1986). Article 502 of the Code of Evidence further provides that "a person upon whom the law confers a privilege against disclosure waives the privilege if he ... voluntarily discloses ... any significant part of the privileged matter."
In a somewhat similar case, our supreme court in State v. Vassel, 285 So.2d 221 (La.1973), reviewed the testimony of a criminal defendant identifying an alibi witness who was with the defendant at the time of the crime. Noting the absence of the alibi witness at the trial, the state asked the defendant on cross examination if he had mentioned the alibi witness to his attorney. The defendant answered the question without objection. In response to the defendant's assertion on appeal that such questioning violated the attorney/client privilege, the court rejected defendant's argument noting the lack of any objection, as well as the defendant's voluntary answer to the question.
In this case, Elbert testified that he disclosed alibi witnesses to McDonald. That fact, assuming it involved a privileged communication, was voluntarily revealed at trial by Elbert, and therefore the privilege was waived. The State then sought in its rebuttal, through McDonald's testimony, to counteract, disprove or discredit Elbert's testimony and to further disprove Rita's assertion that she attempted to report the alibi to McDonald prior to Elbert's trial.
Rebuttal evidence is that which is offered to explain, repel, counteract, or disprove facts given in evidence by the adverse party. State v. McLemore, 26,106 (La.App.2d Cir.6/24/97), 640 So.2d 847, writ denied, 94-1908 (La.12/9/94), 647 So.2d 1107, cert. denied, 514 U.S. 1116, 115 S.Ct. 1974, 131 L.Ed.2d 863 (1995). In criminal cases, such evidence may be used to strengthen the State's original case. La. C.E. art. 611(E). Control of evidence presented by the State on rebuttal is within the sound discretion of the trial court, and will not be disturbed except in extreme cases, such as when the evidence was kept back deliberately for the purposes of deceiving and obtaining an undue advantage. State v. Williams, 445 So.2d 1171 (La.1984); State v. Bass, 595 So.2d 820 (La.App. 2d Cir.), writ denied, 598 So.2d 373 (La.1992). Any witness is subject to impeachment by discreditation. State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 93-2054 (La.2/11/94), 634 So.2d 371; La. C.E. art. 607.
Based upon Elbert's voluntary testimony concerning his revelation of the alibi witnesses to his attorney, the State could properly seek to rebut that testimony and discredit Elbert. Thus, we find that the trial court acted within its sound discretion in allowing McDonald to be questioned on the subject. McDonald's attempt to raise the attorney/client privilege, which was Elbert's personal privilege that he previously waived, was properly rejected by the trial court. Finding no violation of the attorney/client privilege, we reject this assignment of error as meritless.

Motion to Suppress
Williams filed a pre-trial motion to suppress the evidence seized from his home. The trial court denied defendant's motion. Arguing lack of probable cause, Williams challenges the seizure of cash from the lining of his jacket. The affidavit in support of the search warrant was *215 based on information related by two concerned citizens. The defense argues that neither the credibility nor the reliability of either informant was established. The first informant, Lucky, testified at Williams' trial. The second informant was Frazier, who did not testify.
The transcript of the hearing on Williams' motion to suppress reveals the following. Detective Muller testified that he investigated the August 12, 1995 robbery-homicide. He developed the names of the three perpetrators as suspects within one day of the killing. The affidavit in support of the search warrant for the Williams' home was based in part on Detective Muller's interviews with the surviving robbery victims, Shinberger and Tesnear.
Lucky told the police that she saw the three defendants "in possession of a large amount of money and had overheard them talking about doing a robbery" early in the morning of August 12, just after the robbery occurred. Both Lucky and Frazier named the suspects two days after the crime.
Frazier told police that he transported Hampton and Elbert about an hour before the robbery. They asked Frazier to drive them to the liquor store to commit a robbery. They both were armed with semiautomatic handguns, which is the same type of weapon used to kill Coleman. However, Frazier stated that he got "cold feet" and drove away. One of the informants correctly advised the police of Hampton's residential address, as well as of the fact that Hampton recently purchased a blue Oldsmobile. Detective Muller drove by the address and saw Hampton and the Oldsmobile.
After executing the search warrants, Detective Muller never determined that there were any substantial omissions or misstatements by either informant, nor did Detective Muller ever discover any facts which were inconsistent with the information provided by the informants. The trial court ruled that the defense failed to present evidence to override the presumption of the correctness of the search warrant and the constitutionality of the search itself.
When a search warrant has been obtained, the burden is on the defense to show that the search and seizure were unconstitutional. La.C.Cr.P. art. 703(D).[2]
The function of the judicial officer in determining the existence of probable cause is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, that there is a fair probability that contraband or evidence of a crime will be found in a particular place.
Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); State v. Lewis, 535 So.2d 943, 946 (La.App. 2d Cir. 1988), cert. denied, 493 U.S. 963, 110 S.Ct. 403, 107 L.Ed.2d 370 (1989). Under Lewis, the informant's reliability is only one factor the trial court considers when determining whether the search and seizure are valid.
The credibility of an informant is not subject to attack at a hearing on a motion to suppress. The affidavit is presumed valid. Where a defendant seeks to attack the credibility of an informant, he *216 must traverse the credibility of the affiant and make a showing of a "genuine issue supported by convincing allegations" which, if proven, would establish the falsity of the affidavit. State v. Harlan, 556 So.2d 256, 258 (La.App. 2d Cir.), writ denied, 561 So.2d 115 (1990).
In Illinois v. Gates, supra, the United States Supreme Court abrogated the twopronged rule of Aguilar-Spinelli for determining whether an informant's tip establishes probable cause for issuance of a warrant, and substituted a "totality of circumstances" approach. The Court explained that the task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The duty of a reviewing court under Gates is to insure that the magistrate had a substantial basis for concluding that probable cause existed.
In this case, Williams failed to traverse the affiants' credibility. He made only conclusory allegations that the credibility and reliability of the informants were not established. Frazier provided information he had personally observed prior to the robbery, while discussing the plan to rob the liquor store with Hampton and Elbert. Later, Lucky saw Hampton and Williams with over $4000 in cash, and knew they bought cars with cash. Hampton and his car were at the location indicated by Lucky. Based on the totality of these circumstances, there is no showing that the issuing magistrate abused his broad discretion. The totality of the circumstances, as corroborated by the police at the time the search warrant was issued, strongly supports a finding of probable cause. The issuing magistrate made a practical, common sense decision that there was a fair probability that evidence of the crime, e.g., cash or weapons, would be found at the location to be searched. This assignment of error has no merit.

Excessive Sentence
Lastly, Williams argues that his 30 year sentence is excessive. He urges that the trial court failed to give adequate weight to various factors, including his youth at the time of the offense, his lack of a felony record, the fact that Hampton was the leader/organizer of the robbery and the shooter, and the minimal evidence linking him to this crime.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La.C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. *217 2d Cir.), writ denied, 521 So.2d 1143 (La. 1988).
There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App.2d Cir.3/1/00), 754 So.2d 392, writ denied, 2000 1467 (La.2/2/01), 783 So.2d 385; State v. Callahan, 29,351 (La. App.2d Cir.2/26/97), 690 So.2d 864, writ denied, 97-0705 (La.9/26/97), 701 So.2d 979. The record before us adequately indicates the trial court was aware of the matters urged by the defense prior to imposing sentence, i.e., the defendant's youth at the time of the offense, his lack of a felony record, and the fact that Hampton was the leader/organizer of the robberyhomicide.
Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra.
When a manslaughter is committed in furtherance of an armed robbery, the combination elevates a "typical" manslaughter to the "worst" type of manslaughter. State v. Freelon, 26,938 (La. App.2d Cir.5/10/95), 655 So.2d 687, 698. When a defendant commits the worst type of an offense, even a maximum sentence is appropriate. State v. Grissom, 29,718 (La. App.2d Cir.8/20/97), 700 So.2d 541; State v. Walker, 573 So.2d 631 (La.App. 2d Cir. 1991).
Prior to imposing sentence, the trial court reviewed Williams' pre-sentence investigation ("PSI") report. Defendant was expelled from one high school for threatening another student. He completed high school at a different school. The facts of the case show that Hampton was the leader of the robbery team. In separate trials, Hampton was convicted and sentenced to death, and Elbert was convicted and sentenced to life at hard labor. Williams was the youngest and the least culpable of the offenders, but was nonetheless a principal participant. In the PSI interview, defendant denied any participation in the crimes. That claim is refuted by the evidence. Williams was present at the planning of the robbery; he was present during the commission of the robbery-homicide; and he received part of the robbery proceeds.
The PSI report additionally shows that Williams has a "significant" juvenile criminal history. He is still awaiting trial on a second degree battery charge, which arose after the instant offense, when Williams beat a fellow inmate at Caddo Correctional Center. The PSI report details defendant's education, family background, marital status, and his health and employment records. Thus, the sentencing court was aware of all information required by La.C.Cr.P. art. 894.1.
Here, Williams received great lenience from the jury in light of the overwhelming evidence showing his guilt on the charged offenses of second degree murder and armed robbery. This manslaughter is one of the worst types of manslaughter for which the maximum 40 year sentence could have been imposed and sustained on appeal. The trial court did not impose the maximum sentence, but again gave Williams leniency, presumably due to his *218 age. This 30 year sentence does not shock the sense of justice when considered in light of the violent crimes committed. Williams' sentence is not constitutionally excessive. His assignment has no merit.

Error patent review
We have reviewed the record for error patent, but found none.

Conclusion
The evidence introduced at trial was sufficient to support defendant's conviction beyond a reasonable doubt. Having found no meritorious assignment of error, we affirm defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The State argues that there is no presumption of prejudice regarding this challenge. Here, the State claims that Williams did not use all twelve of his peremptory challenges. Contrary to the State's argument, our review of the record indicates that the defense exhausted all twelve of its peremptory challenges.
[2] La.C.Cr.P. art. 703(D) states: "On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant."